RECEIVED

DEC – 5 2016

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

JOHN F. STROY                                   CIVIL ACTION NO.: 13-2423

VERSUS                                          JUDGE DOHERTY

DEPARTMENT OF VETERANS AFFAIRS,                 MAGISTRATE JUDGE WHITEHURST
   ET AL.

## MEMORANDUM RULING

Before the Court is the "Second Motion to Dismiss and Motion for Summary Judgment" [Doc. 42] filed by Sloan Gibson, the Interim Secretary of the Department of Veterans Affairs. The motion is opposed by the plaintiff John F. Stroy [Doc. 44], and the defendant has filed a Motion for Leave to File a Reply Brief [Doc. 46], which is herein GRANTED. With the permission of this Court, defendant filed a Supplemental Brief [Doc. 51], and the plaintiff filed a Motion for Leave to File a Supplemental Memorandum [Doc. 54], which is DENIED for the reasons stated hereinbelow. The defendant filed a Response to the plaintiff's proposed supplemental memorandum on September 6, 2016 [Doc. 56]. As is evident from the record, the issues before the Court have been extensively briefed, and the motion is ripe for consideration.

## I.    Background

Plaintiff – a sixty-five year old African-American male employed by the Department of Veterans Affairs ("VA") as a primary care physician[1] – brought this suit, alleging his employer

---

[1] It is undisputed that the plaintiff was employed by the VA as a primary care physician at the Lafayette Community Based Outpatient Clinic ("CBOC"). The Lafayette CBOC falls under the Veterans Affairs Medical Center in Alexandria (VAMC), and CBOC employees are supervised by employees located in Alexandria, Louisiana.

engaged in unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.* Specifically, plaintiff alleges he suffered unlawful discrimination based upon

his race, and suffered retaliation for complaining of same. The following facts, taken from

defendant's statement of uncontested material facts, are not in dispute, except where footnoted:

- On March 1, 2011, plaintiff ordered lab tests for a patient with a history of bladder cancer with urinary tract infections, prosate cancer, and lung cancer.

- On March 3, 2011, the same patient was seen by Dr. Veronica Adoun (African-American female), an internal medicine physician, employed at the Lafayette CBOC.

- On March 9, 2011, the patient was seen by Dr. Bettina Fitzgerald (Caucasian female), an internal medicine physician, employed at the Lafayette CBOC.

- On March 21, 2011, plaintiff saw the patient again.  The plaintiff ordered lab tests on March 21, but the order did not go out until the following day.  On March 21, 2011, plaintiff adjusted the patient's medications.  Results from the patient's lab tests were not available until March 22 or 23, 2011.  Plaintiff was on leave and not in the CBOC on March 22 or March 23, 2011.[2]

- The patient returned to the Lafayette CBOC on March 23, 2011 and was seen by staff psychiatrist, Dr. Claire Leulf (Caucasian female).

- On March 23, 2011, the patient was admitted to the Alexandria VAMC in acute renal failure.

---

[2] Although the plaintiff does not deny the facts as set forth in this paragraph, he attempts to provide context for his actions and decision-making, to wit:

> Denied as written. Dr. Stroy was the third primary care physician the patient had seen that month, and then the patient saw the psychiatrist, Dr. Leulf. Dr. Stroy ordered the lab tests since the patient and family were not willing to go to the local hospital in order to check the patient's kidney function and electrolyte levels and to confirm my suspicion that the prescription diuretic medication prescribed by Dr. Fitzgerald had a negative impact on the patient's medical condition. (See Exhibit 1). The patient and family agreed to return to the Lafayette CBOC for the lab results since the patient had an appointment with the Psychiatrist, Dr. Luelf. (See Exhibit 1). The lab results revealed that the patient was severely dehydrated and was experiencing acute renal failure, confirming my earlier suspicion regarding the prescription diuretic medication. (See Exhibit 1). Dr. Stroy does not recall adjusting the patient's medications.

*See* plaintiff's Statement of Uncontested Facts, Doc. 44, at ¶6.

- Medical Center Memorandum No. 00Q-22, *Peer and Clinical Review Program for Quality Management Purposes*,[3] dated October 28, 2010, provides that the VA peer review process "addresses those reviews designated in advance as being conducted for Quality Management purposes to improve medical care and/or utilization of resources within a non-punitive context."[4]

- Memorandum No. 00Q-22 provides that "[i]nformation from these processes may not be used for personnel actions, disciplinary action, to affect privileges, or to affect employment."[5]

- Memorandum No. 00Q-22 provides that "[a]bnormal Laboratory, x-ray or other test result not addressed by a physician" is an indication for peer review. The Memorandum further provides that "[u]nscheduled admissions within three (3) days following ambulatory care visit" are peer reviewed at the "100% level."[6]

- On June 17, 2011, a peer review committee met to review the medical care provided by plaintiff to the patient on March 21, 2011. The committee determined that plaintiff's medical care should be assigned a "Level III," which is a finding that "Most experienced competent practitioners would have managed the case differently."

- Plaintiff was on leave when the peer review committee met on June 17, 2011.

- On September 21, 2011, Dr. Mary Morehouse, former Chief of Primary Care, presented plaintiff with the peer review committee's determination.

---

[3] "Peer review" is defined in the VA's policies as "a traditional organizational function of critical review of an episode(s) of care to assist in improving the quality of medical care and appropriate utilization of healthcare resources."

"Clinical review" is defined as follows:

Clinical Review is a process by which patient events with potential for high risk are screened against specific criteria or standards of practice. Ongoing reviews of these events identify opportunities to improve the care and treatment of an individual patient or groups of patients and to identify patterns and trends. Potential problems will also be detected that are non-practitioner in origin, but are related to systems, process or equipment factors that impact care. Clinical reviews are a means of identifying situations requiring further, protected peer review. Implementation of Occurrence Screening elements for clinical and peer reviews is maintained at the 100% level at this medical center.

[4] *See* Memorandum No. 00Q-22, attached as Exh. 1-H to defendant's motion, Doc. 42, at p. 1, ¶ I, A.

[5] *See Id.* at p. 1, ¶ I, C.

[6] *Id.* at p. 6, ¶ 21.b.

- On September 23, 2011, plaintiff sent an email to Dr. Morehouse and Dr. Paul Molinar, former Chief of Staff, advising them that he had not previously been informed of the peer review, or given the opportunity to respond, and requested an explanation for "inconsistencies" in the procedure.

- Another peer review committee meeting was scheduled for October 28, 2011 but was canceled due to unexpected travel by one of the members of the Administration. An ad hoc peer review committee meeting was rescheduled for November 4, 2011.

- On November 1, 2011, plaintiff initiated contact with an EEO counselor claiming race-based discrimination and complaining that he was the subject of an improper peer review process.

- On or about November 4, 2011, a second peer review committee met to review the medical care provided by plaintiff. Plaintiff met with the committee by video teleconference to respond to the peer review. The committee revised the Level III finding to a Level I finding, which is a finding that "[m]ost experienced competent practitioners would have managed the case in a similar manner."

- On November 30, 2011, the VA Office of Resolution Management (ORM) closed informal counseling on plaintiff's claim of discrimination and notified him that he had 15 days to file an individual complaint of discrimination (formal administrative complaint or EEO complaint). Plaintiff received the notification on December 1, 2011.

- On December 16, 2011, plaintiff mailed an EEO complaint of discrimination, which was received by the VA on December 19, 2011.

- On March 19, 2012, ORM accepted plaintiff's individual complaint of race discrimination. The administrative claim is identified as 2003-0502-2012100404.

- On September 5, 2012, plaintiff's patient was found unattended in the Lafayette CBOC. The foregoing was reported to Dr. Suzanne Taylor, who, on September 3, 2012, became the Acting Chief of Staff for the Alexandria VAMC, supervising all disciplines of medicine.

- On or about September 6, 2012, Dr. Taylor conducted a provider meeting with the Lafayette CBOC providers including physicians and nurses.

- On September 12, 2012, Dr. Taylor required Plaintiff to travel to Alexandria to meet with Dr. Jose Rivera, Acting Chief of Primary Care, on September 13, 2012. The meeting was to address a grievance submitted by Nurse Cleo Simien. Nurse Simien, an African-American female, is employed by the VA at the Lafayette

4

CBOC and assigned to plaintiff's provider team.  Plaintiff, the Union President, and Dr. Rivera met at the Alexandria VAMC on September 13, 2012.

- A Memorandum dated September 20, 2012 with the subject, "Supervisor Fact Finding Report," was issued pertaining to the incident of plaintiff's patient being left unattended on September 5, 2012.

- On September 21, 2012, Dr. Taylor issued a Memorandum to plaintiff entitled, "Expectations of Behavior."  Plaintiff was provided with a copy of this memorandum on September 21, 2012.

- On October 14, 2012, plaintiff sought to amend his administrative complaint to include an additional claim asserting retaliation.

- On October 18, 2012, plaintiff initiated contact with an EEO counselor as to the additional claim of retaliation.

- On December 5, 2012, EEO Administrative Judge Kevin Rung denied plaintiff's motion to amend his original EEO complaint of discrimination to add the retaliation claim.

- On January 16, 2013, ORM closed the informal counseling on plaintiff's retaliation claim and notified him that he had 15 days to file an individual complaint of discrimination. Plaintiff received this notification on January 21, 2013.

- On February 5, 2013, plaintiff submitted an EEO complaint asserting retaliation.

- On March 4, 2013, ORM accepted plaintiff's second EEO complaint asserting retaliation. This administrative claim is identified as 2003-0502-2013100237.

- On August 2, 2013, plaintiff -- proceeding *pro se* – filed an original Complaint in this action.

- On August 19, 2013, ORM's notified the plaintiff that Case No. 2003-0502-2013100237 was dismissed because the case was the basis of a civil action pending in the federal district court for the Western District of Louisiana.

Plaintiff filed the instant lawsuit on August 2, 2013 and amended his complaint on June 24,

2014.  In his Amended Complaint, the plaintiff alleges claims of race discrimination and retaliation.

The instant motion is two-fold.  First, the defendant seeks dismissal of the plaintiff's retaliation claim under Rule 12(b)(1) on grounds the plaintiff failed to exhaust his administrative remedies on this claim when he commenced this civil action prior to completing the administrative EEO process.  Second, the defendant seeks summary dismissal of the plaintiff's race discrimination claims related to the peer review process under Fed.R.Civ. P. 56, on grounds there is no probative evidence that any of the VA's actions were motivated by discriminatory intent based upon the plaintiff's race, and alternatively, because the peer review process does not constitute an adverse employment action.  Finally, the defendant argues even if this Court were to find the plaintiff properly exhausted his retaliation claim at the administrative level, the claim should nevertheless be summarily dismissed under Fed.R.Civ.P. 56 because the plaintiff has no evidence to support it.

When faced with multiple grounds for dismissal in a motion, a federal district court should consider subject matter jurisdiction before any determination on the merits.  *Ruhrgas v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (noting, however, that the same principle does not dictate a sequencing of jurisdictional issues).  Consequently, this Court will address the grounds for dismissal urged under the motion to dismiss for lack of subject matter jurisdiction before addressing the motion for summary judgment.

## II.    Law and Analysis

### A.    Plaintiff's Motion for Leave to File a Supplemental Memorandum [Doc. 54]

Before the Court addresses the substantive issues in the pending motion, it is necessary to discuss this Court's reasons for denying the plaintiff's motion for leave to file a reply brief [Doc. 54].  On August 16, 2016, this Court conducted a telephone status conference to discuss the pending motion to dismiss/motion for summary judgment filed by the defendant.  At that time, all briefing

deadlines associated with the pending motion had passed, and the dispositive motion deadline had

passed on April 28, 2016.  Despite the fact that the deadlines had passed, this Court issued the

following directive:

> Due to the new jurisprudence from the Fifth Circuit brought to the Court's attention
> by defendant, in two pages or less, the government has seven (7) days to supplement
> their motion for summary judgement as to the new jurisprudence.  The plaintiff[]
> ha[s] seven (7) days beyond that to respond.[7]

On August 22, 2016, pursuant to the Court's order, the defendant filed a two-page

Supplemental Brief [Doc. 51], citing a recent Fifth Circuit case that the defendant argues is relevant

to the plaintiff's retaliation claim.  In response, on August 30, 2016, the plaintiff filed a Motion for

Leave to File a Supplemental Memorandum in Opposition to the Defendant's Motion to Dismiss and

Motion for Summary Judgment" [Doc. 54].  The motion does not argue the applicability of any

recent jurisprudence – as this Court allowed the parties to do by way of the August 16, 2016 minute

entry – but rather, argues the application of an "EEOC Enforcement Guideline on Retaliation,"

which, as far as this Court can determine, has not been cited or mentioned in any party's briefs

heretofore.

Thus, by way of a response to the defendants' properly filed supplemental brief, the plaintiff

is attempting to assert a new argument in support of its opposition to the pending motion.  This Court

notes its directive to the defendant to file supplemental briefs to address recent jurisprudence bearing

on issues already briefed – but not previously cited – was not an invitation to present new arguments

to the Court on grounds not previously argued in any of the briefs.  Nevertheless, because this Court

concludes the plaintiff's retaliation claim has not been administratively exhausted and is subject to

dismissal for lack of subject matter jurisdiction – for the reasons stated in this Memorandum Ruling

---

[7] *See* Minutes of Telephone Status Conference, Doc. 50.

– it is unnecessary for this Court to examine the merits of the plaintiff's new argument in support of his retaliation claim. Considering the foregoing, the plaintiff's Motion for Leave to File a Supplemental Memorandum in Opposition to the Defendant's Motion to Dismiss and Motion for Summary Judgment" [Doc. 54] is DENIED AS MOOT.

### B. Motion to Dismiss under Rule 12(b)(1)

#### 1. Legal Standard

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. *See Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). *See also* Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming*, 281 F.3d at 161, *citing Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir.1996). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming*, 281 F.3d at 161, *citing McDaniel v. United States*, 899 F.Supp. 305, 307 (E.D.Tex.1995). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does, in fact, exist. *Ramming*, 281 F.3d at 161, *citing Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980).

In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Ramming*, 281 F.3d at 161, *citing Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain the plaintiff cannot prove any set of facts in support of his claim that

would entitle plaintiff to relief. *Ramming*, 281 F.3d at 161, *citing Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5ᵗʰ Cir.1998).

### 2.   Analysis

The gist of plaintiff's retaliation claim is that the plaintiff was retaliated against for filing a race discrimination claim against the VA. Defendant seeks dismissal of the plaintiff's retaliation claim on grounds the plaintiff failed to exhaust administrative remedies by filing the instant lawsuit prematurely, which deprives this Court of jurisdiction over the claim. This Court agrees.

As a precondition to filing suit in federal court, Title VII specifically requires a federal employee claiming retaliation to exhaust his administrative remedies. *Randel v. U.S. Dep't of Navy*, 157 F.3d 392, 395 (5ᵗʰ Cir. 1998), *citing Brown v. General Servs. Admin.*, 425 U.S. 820, 832, 96 S.Ct. 1961, 1965, 48 L.Ed.2d 402 (1976) ("Initially, the complainant must seek relief in the agency that has allegedly discriminated against him."). The complainant also must file his complaint in a timely manner. *See Tolbert v. United States*, 916 F.2d 245, 247 (5ᵗʰ Cir.1990) (*per curiam*). If the claimant fails to comply with either of these requirements, the court is deprived of jurisdiction over the case. *Id.*

The Fifth Circuit explained the exhaustion requirement in *Tolbert, infra*, to wit:

> Since the facts here are undisputed, the question is simply whether the district court had jurisdiction of Tolbert's claim. It did not. There are two requirements for filing a Title VII action in federal court: 1) the complaint must be filed within the time allotted by Title VII, and 2) **the complainant must first have exhausted her administrative remedies. Failure to comply with either of these requirements wholly deprives the district court of jurisdiction over the case; it is the well-settled law of this circuit** that each requirement is a prerequisite to federal subject matter jurisdiction.
>
> As to the time limitation for filing, Tolbert argues that the cases in this Circuit hold only that it is filing too late, and not too early, which deprives the court of jurisdiction. While this is not a promising argument—it seems obvious that anyone

who files too early, has, by definition, filed before she has exhausted her administrative remedies—it need not be pursued here. It is clear that at the time Tolbert filed her action she had not exhausted her administrative remedies; thus, the court had no jurisdiction over the action, and was required to dismiss it.

916 F.23d at 247-48 (emphasis added) (internal citations omitted).

In the instant case, the plaintiff acknowledges he filed the instant lawsuit two days before the lapse of the 180-day exhaustion period.   The plaintiff argues the EEOC has since issued a final decision on the plaintiff's retaliation claim, and therefore, the deficiency of "failing to exhaust administrative remedies" has been remedied and this Court has jurisdiction over the retaliation claim.

However, the Fifth Circuit expressly rejected a similar argument in *Tolbert*, noting:

> **The only remaining question is whether the defect in Tolbert's action was cured when the EEOC issued its decision before Tolbert's claim was dismissed by the district court. In such a case, the rule must be that the defect was not cured. To hold otherwise would allow a plaintiff to file an action and begin civil proceedings—discovery, motions to dismiss and for summary judgment, and so on—before completing the course of administrative review. A plaintiff could thereby largely circumvent the rule that she must exhaust her administrative remedies. To allow a plaintiff to proceed in such a fashion would, in short sequence, produce all of the evils that are designed to be avoided by requiring exhaustion of administrative remedies.**

> This is, admittedly, a strict construction of the Title VII exhaustion requirement. Such a strict construction, however, is necessary if the aims of the exhaustion requirement are to be served. Moreover, this construction does not impose any great additional burden on Title VII plaintiffs or their counsel. The rule is simple: file in the time allotted, and neither before nor after. Certainly a decision which prohibits Title VII plaintiffs from filing their complaints too early creates no greater burden than does the well-settled prohibition against filing too late. Although we may have misjudged the profession, we suspect that most lawyers will not have much trouble complying with a rule which forbids them to file too promptly.

916 F.2d at 249-50 (emphasis added).

The plaintiff argues there is a "disagreement in the Fifth Circuit Court of Appeals" regarding whether exhaustion requirements in Title VII cases are jurisdictional, and this agreement was

recognized by the Fifth Circuit *pre-Tolbert*, in *Pacheco v. Mineta*, 448 F.3d 783, 7898 n.7 (5ᵗʰ Cir.

2006).  In *Pacheco*, the court explained:

> There is disagreement in this circuit on whether a Title–VII prerequisite, such as
> exhaustion, is merely a prerequisite to suit, and thus subject to waiver and estoppel,
> or whether it is a requirement that implicates subject matter jurisdiction. The
> Supreme Court has held that the EEOC or EEO filing deadlines are not jurisdictional.
> However . . . [n]either the Supreme Court nor this court sitting en banc has ruled that
> the exhaustion requirement is subject to waiver or estoppel, and our panels are in
> disagreement over that question. *Compare Tolbert v. United States*, 916 F.2d 245,
> 247 (5ᵗʰ Cir.1990) ("[I]t is the well-settled law of this circuit that each [Title VII]
> requirement is a prerequisite to federal subject matter jurisdiction.") and *Porter v.
> Adams*, 639 F.2d 273, 276 (5ᵗʰ Cir.1981) ("The exhaustion requirement ... is an
> absolute prerequisite to suit") and *Randel v. Dep't. of U.S. Navy*, 157 F.3d 392, 395
> (5ᵗʰ Cir.1998) ("If the claimant fails to comply with either of these [Title VII]
> requirements then the court is deprived of jurisdiction over the case.") with *Young
> v. City of Houston, Tex.*, 906 F.2d 177, 180 (5ᵗʰ Cir.1990) ("A failure of the EEOC
> prerequisite does not rob a court of jurisdiction.") and *Fellows v. Universal
> Restaurants, Inc.*, 701 F.2d 447, 449 (5th Cir.1983) ("The basic two statutory
> requirements (although these are not necessarily 'jurisdictional') for a Title VII suit
> are...."). Because neither party has a winning waiver or estoppel argument, we need
> not take sides in this dispute.

*Id.*

This Court is mindful of the plaintiff's argument and takes notice of the disagreement among

the district courts regarding the issue.  However, in *Tolbert*, which was decided <u>after</u> *Pacheco*, the

Fifth Circuit, in a *per curiam* decision, reaffirmed a strict construction of the Title VII exhaustion

requirement and dismissed a claim that had been filed prematurely, notwithstanding that the EEOC

issued a final determination following the filing of the civil action.  Unless and until the Fifth Circuit

addresses the issue and reverses its rationale in *Tolbert*, this Court is bound to give effect to the

rationale of *Tolbert*.

Consequently, the defendant's motion to dismiss plaintiff's retaliation claim under Rule

12(b)(1) on grounds the plaintiff failed to exhaust his administrative remedies is GRANTED, and

the foregoing claim is DISMISSED WITHOUT PREJUDICE.  Because this Court concludes the

plaintiff's retaliation claim is subject to dismissal for lack of subject matter jurisdiction, this Court

declines -- and indeed is without jurisdiction – to consider the defendant's alternative request for

relief with respect to plaintiff's retaliation claim.

### C.      Motion for Summary Judgment

#### 1.      Legal Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory

judgment is sought may, at any time, move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part thereof."  FED. R. CIV. PROC. 56(b).  Summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response by affidavits or as otherwise
> provided in this rule, must set forth specific facts showing that there is a genuine
> issue for trial.  If the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility
> of demonstrating the absence of an issue of material fact with respect to those issues
> on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477
> U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial,
> the movant may merely point to an absence of evidence, thus shifting to the
> non-movant the burden of demonstrating by competent summary judgment proof that

12

there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

. . . .

. . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both

> parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### 2.     Analysis

#### a.     Peer review

In his complaint, the plaintiff alleges the VA discriminated against him on the basis of his race when the medical care he provided to a patient on March 21, 2011 was peer reviewed, alleging white physicians who also provided medical care to the patient were not peer reviewed – thereby alleging a claim of disparate treatment – and asserting the racial bias of the peer review committee due to its composition of only white members. In the instant motion, the defendant seeks summary dismissal of the plaintiff's race discrimination claims on grounds the plaintiff cannot establish a *prima facie* case of discrimination.

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). "Direct evidence

14

of discrimination is evidence which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 958 (5th Cir. 1993). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)." *See also Russell*, 235 F.3d at 222.

To survive summary judgment, the plaintiff must satisfy the burden shifting test found in *McDonnell Douglas, infra.* Under this test, the plaintiff must first establish a *prima facie* case of discrimination, and if he successfully does so, the defendant shall respond by setting forth its legitimate, non-discriminatory reason for its decision. *Septimus v. University of Houston*, 399 F.3d 601, 609 (5th Cir. 2005), *citing Reeves v. Sanderson Plumping Prod., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106; *Okoye*, 245 F.3d 507, 512 (5th Cir. 2001). If the defendant produces a legitimate reason, any presumption of discrimination raised by the plaintiff's *prima facie* case vanishes. *Septimus*, 399 F.3d at 609, *citing Okoye*, 245 F.3d at 512. However, the plaintiff may still avoid summary judgment if he demonstrates a genuine issue of material fact whether the legitimate reasons proffered by the defendant are not its true reasons, but instead are a pretext for discrimination. *Id.*

The plaintiff may establish his *prima facie* case of racial discrimination by showing he: (1) is a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) because this case involves a claim of race discrimination based upon disparate treatment, other similarly situated persons were treated more favorably. *Okoye*, 245 F.3d at 512; *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). The fourth element requires a showing "that the employer gave preferential treatment to another

employee under 'nearly identical' circumstances . . . ." *Id.* at 514 (internal quotations and punctuation omitted).[8]

In this matter, the Court will assume plaintiff alleges he was discriminated against by way of disparate treatment, in that he alleges "[d]efendant treated the [p]laintiff differently from similarly situated employees who are not African-American,"[9] specifically arguing in his opposition brief that Caucasian physicians who also provided medical care to the patient were not peer reviewed. Additionally, plaintiff alleges "[w]hite employees are treated more favorably by receiving more desirable work assignments, being allowed to take breaks, and by not being reprimanded when their patients are not seen but are allowed to reschedule.'"[10] [Id.¶ 28].

The defendant argues the plaintiff can meet the first two elements of his *prima facie* burden, but argues the evidence is insufficient as to the third and fourth elements. Specifically, the defendant argues the plaintiff cannot show similarly situated employees outside his protected class were treated

---

[8] The United States Supreme Court recognizes that "[d]isparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics.] Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment...." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993), *citing Teamsters v. United States*, 431 U.S. 324, 335-336, n. 15, 97 S.Ct. 1843, 1855, n. 15, 52 L.Ed.2d 396 (1977) (citation omitted) (construing Title VII of Civil Rights Act of 1964). **In a disparate treatment case, liability depends on whether the protected trait . . . actually motivated the employer's decision.** *Hazen Paper Co.*, 507 U.S. at 609, *citing United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Dept. of Community Affairs v Burdine*, 450 U.S. 248, 252-256, 101 S.Ct. 1089, 1093-1095, 67 L.Ed.2d 207 (1981); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576-578, 98 S.Ct. 2943, 2949-2950, 57 L.Ed.2d 957 (1978). The employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait, *see, e.g., Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 704-718, 98 S.Ct. 1370, 1373-1380, 55 L.Ed.2d 657 (1978), or the employer may have been motivated by the protected trait on an ad hoc, informal basis. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). **"Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."** *Hazen Paper Co.*, 507 U.S. at 610.

[9] *See* plaintiff's Amended Complaint, Doc. 12, at ¶27.

[10] *Id.* at ¶28.

more favorably because of their race, and also argues that, under the law, a peer review investigation does not qualify as an "adverse employment action." Alternatively, the defendant argues its reasons for not peer reviewing the medical care provided by the other physicians were not pretext for any unlawful discrimination.

### i.      Similarly situated employees

This Court first addresses the plaintiff's argument that <u>other similarly situated physicians were treated more favorably</u>, a required element of a prima facie cases of race discrimination. Consideration of this argument requires an understanding of the VA's policy with respect to peer reviews.

Peer reviews within the VA are prompted by certain "triggering events." After review of the record in this matter, it appears the plaintiff and defendant are framing the "triggering event[s]" differently in this matter, or at least are blending the two potential "triggering events" in presenting their arguments concerning whether or not the plaintiff satisfies his prima facie burden.   VA Memorandum No. 00Q-22 expressly refers to two "triggering events" that are relevant in the instant case: (1) an "[a]bnormal Laboratory, x-ray or other test result not addressed by a physician;" and (2) an "[u]nscheduled admissions within three (3) days following ambulatory care visit" are peer reviewed at the "100% level."[11]  The Court will address each "triggering event" in turn.

### Abnormal labs or test results not addressed by a physician

The record shows the plaintiff examined the patient on March 21, 2011 and ordered lab work. To the extent this event can be construed as "care" that was provided by the plaintiff on March 21, 2011, the Court agrees that "care" constitutes a "triggering event," because the labs that were ordered

---

[11] *Id.* at p. 6, ¶ 21.b.

17

by the plaintiff on March 21, 2011 were not read until March 23, 2011, at which time they revealed acute renal failure. This Court construes the foregoing as an event in which an abnormal lab was not addressed by the plaintiff physician, and, under VA policy, this event would automatically trigger the peer review process.

### Unscheduled admissions within three (3) days following ambulatory care visit

VA policy also expressly states peer review is triggered by "[u]nscheduled admissions within three (3) days following ambulatory care visit including the Emergency Department." In a sworn affidavit, non-voting peer review committee member Chandra Harris stated:

> A peer review addresses a specific episode of care. In this case, the episode of care under review occurred on March 23, 2011 [the patient's admission to the VAMC.] Other physicians were not involved in this episode of care."

Dr. Scott Gremillion, Associate Chief of Staff for Extended Care and Geriatrics at the VA Healthcare System in Alexandria, confirmed Harris's testimony, stating the "trigger" for the plaintiff's peer review was "an admission to the hospital with a man who had abnormal presenting laboratory data." Thus, this Court construes the patient's unscheduled admission to the emergency department (on March 23, 2011) within three days of the "care" provided by the plaintiff (on March 21, 2011) as an event that, under VA policy, would trigger the peer review process.

Thus, regardless of how the "triggering event" is framed *by the parties* throughout their briefing, this Court concludes both factual scenarios – (1) the plaintiff's abnormal labs – which were ordered by the plaintiff on March 21, 2011 but were not read until March 23, 2011, at which time they revealed acute renal failure, and (2) the admission of the patient to the VAMC in Alexandria, Louisiana on March 23, 2011 in acute renal failure – constitute "triggering events" for purposes of peer review. The defendant argues both of the foregoing events triggered automatic peer review of

18

the plaintiff's care given on March 21, 2011, and the peer review process was not triggered by the plaintiff's race. Considering the foregoing, this Court concludes the defendant has produced a legitimate reason for the peer review of the plaintiff. Thus, any presumption of discrimination raised by the plaintiff's *prima facie* case vanishes. *Septimus*, 399 F.3d at 609, *citing Okoye*, 245 F.3d at 512. However, the plaintiff may still avoid summary judgment if he demonstrates a genuine issue of material fact regarding whether the legitimate reasons proffered by the defendant are not its true reasons, but instead are a pretext for discrimination. *Id.*

The plaintiff attempts to avoid summary judgment by arguing the "negative peer review" was discriminatory and pretextual because two other Caucasian doctors – Dr. Leulf and Dr. Fitzgerald – also treated the plaintiff before the March 23, 2011 admission to the emergency department and were not subjected to the peer review process.[12] As stated, in a disparate treatment case, a plaintiff must show the employer "gave preferential treatment to [ ] [another] employee under 'nearly identical' circumstances[;]" that is, "that the misconduct for which [the plaintiff] was discharged[13] was nearly identical to that engaged in by ... [other] employee[s]." *Okoye*, 245 F.3d at 514, *citing Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir.1991); *Smith v. Wal–Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.1990).

Again, in the instant case, the plaintiff compares himself to two Caucasian doctors who were not peer reviewed. The first doctor – Dr. Bettina Fitzgerald – last examined the patient on March

---

[12] A third doctor – Dr. Victoria Adoun – also examined the patient prior to his admittance to the VMAC. However, the record shows Dr. Adoun examined the patient on March 3, 2011, more than three days before the patient's admittance to the emergency department, and there is no evidence Dr. Adoun ordered lab results. Finally, it is undisputed that Dr. Adoun is African American. Therefore, this Court concludes, under VA policy, Dr. Adoun's care of the patient would not have triggered a peer review under the facts and circumstances presented to the Court.

[13] This Court will address the defendant's argument that the peer review process is not an "adverse employment action" – similar to discharge – later in the Ruling.

9, 2011, and therefore, did not examine the patient within three days of the patient's admission to the VMAC. This Court concludes, therefore, that Dr. Fitzgerald is not similarly situated to the plaintiff. The second doctor -- Dr. Claire Leulf – examined the patient on March 23, 20111, the date the patient was admitted to the VMAC and, therefore, examined the plaintiff within three days of the patient's admission to the VMAC. However, Dr. Leulf is a staff psychiatrist. Although neither party has provided this Court with the nature of the patient's visit with Dr. Leulf, the record is clear that Dr. Leulf did not order the labs that indicated renal failure; thus, there is no evidence before this Court that Dr. Leulf was even aware that there was a problem with the patient's kidneys. Considering the foregoing, this Court concludes the circumstances of the patient's visit with Dr. Leulf cannot be considered "nearly identical" to the circumstances of the patient's visit with the plaintiff, and Dr. Leulf is, therefore, not similarly situated for purposes of a disparate treatment claim.

Considering the foregoing, this Court concludes the plaintiff fails to establish a critical element of his *prima facie* case of racial discrimination, *i.e.*, he fails to raise a genuine issue of material fact with respect to his allegation that other similarly situated persons were treated more favorably. *Okoye*, 245 F.3d at 512; *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). For this reason alone, the plaintiff's race discrimination claim is subject to dismissal.

### ii.   Adverse employment action

This Court also concludes the plaintiff fails to present a prima facie claim of race discrimination because he fails to show he was subjected to an adverse employment action. The defendant argues a peer review investigation is not considered an adverse employment action as a

matter of law. Under well-established Fifth Circuit jurisprudence, only "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating" satisfy the adverse employment action element." *Banks v. East Baton Rouge Parish School Bd.*, 320 F.3d 570, 575 (5th Cir. 2003), *citing Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995). Title VII does not address "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Banks*, 320 F.3d at 575, *citing Burger v. Cent. Apartment Mgmt.*, 168 F.3d 875, 878 (5th Cir.1999). To be actionable, an adverse employment decision must be a "tangible employment action that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 855 (S. D. Tex. 2010) (J. Harmon), *citing Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Fifth Circuit has explained:

> For example, a decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action under Title VII. See Burger, 168 F.3d at 878–80 (holding that an employer's refusal of an employee's *576 request for a "purely lateral transfer" does not qualify as an adverse employment action under Title VII); Dollis, 77 F.3d at 782 (affirming the decision that an employer's denial of a "desk audit" to a female employee is not an adverse personnel action under Title VII, even though the employee claimed it was an ultimate employment decision that restricted her "promotional opportunities").

*Banks*, 320 F.3d at 575.

In the instant case, the plaintiff argues "undeserved negative performance review[s]" constitute an adverse employment action, however the plaintiff does not cite to Fifth Circuit jurisprudence in support of his argument. *See, e.g., Brooks v. City of San Mateo*, 229 F.3d 917, 928

21

(9th Cir. 2000); *Wyatt v. City of Boston*, 35 F.3d 13, 15-15 (1st Cir. 1994).  Indeed, the VA policy on peer reviews states:

> C.     Information from these processes <u>may not be used for personnel actions, disciplinary actions, to affect privileges, or to affect employment.</u>[14]

Furthermore, this Court notes although the plaintiff obtained a Level III finding from the peer review committee on June 17, 2011 – which provides that "Most experienced competent practitioners would have managed the case differently" – on November 4, 2011, a second peer review committee met to review the medical care provided by plaintiff and thereafter revised the Level III finding to a Level I finding, which is a finding that "Most experienced competent practitioners would have managed the case in a similar manner."  Thus, the plaintiff fails to show the peer review process conducted negatively impacted him.  Furthermore, the plaintiff has presented no evidence that his employment status was altered in any way as a result of the peer review findings that were related to the triggering events that were reviewed, and specifically testified he has not received any bad proficiency report citing the episodes in question.[15]

Considering the foregoing, this Court concludes the plaintiff fails to establish a second element of his *prima facie* case of racial discrimination, *i.e.*, he fails to raise a genuine issue of material fact with respect to his allegation that he was subjected to an adverse employment action.

---

[14] *See* "Peer and Clinical Review Program for Quality Management Purposes," attached as Exh. 1-G to defendant's motion, Doc. 42.

[15] *See* EEO investigation transcript of John Stroy, attached as Exhibit 1-C to defendant's motion, Doc. 42, at p. 39-40.

      b.     **Racial bias of the peer review committee**

Finally, the plaintiff argues he was the subject of race discrimination because of the racial bias of the peer review committee, which was composed of only white members.  The defendant avers that the foregoing argument is factually incorrect and that legitimate reasons existed for the composition of the peer review committee.

Dr. Suzanne Taylor, Acting Chief of Staff for the Alexandria VMAC beginning on September 3, 2012, testified that each VMAC has a Peer Review Committee comprised of the Chief of Staff of that facility, as well as members of the facility's Credentialing and Privileging Committee, other senior medical staff members and professional disciplines, and the facility's Nurse Executive.[16] The defendant argues the Peer Review Committee consists of persons who occupy specific <u>positions</u> within the facility, rather than specifically appointed individuals.  In other words, the Peer Review Committee is made up of certain positions within the hospital – and the staff members that occupy those positions – rather than specifically appointed individuals.

The record shows the voting members of the Peer Review Committee that reviewed the triggering events at issue were Scott Gremillion, M.D. (Acting Chief of Staff); Shivani Negi, M.D. (Acting Chief – Medical Service); John Richey, M.D. (Acting Chief – Specialty Care Service); Paul Molinar, M.D., J.D. (Chief – Psychiatry Service); Michael Fitzsimmons, M.D. (Chief – Pathology and Laboratory Medicine Service); and Amy Lesniewski, R.N., M.S.N., (Nurse Executive).  The defendant argues Dr. Negi is Indian-American.  In the absence of any argument to the contrary, this

---

[16] *See* Medical Center Memorandum No. 00Q-22, *Peer and Clinical Review Program for Quality Management Purposes,* dated October 28, 2010, at III(G), attached to defendant's motion as Exhibit 1-H.  See also Deposition of Dr. Suzanne Taylor, attached as Exhibit 3 to the defendant's motion, at p. 26.

Court will assume, for purposes of this motion, that the remaining members of the Peer Review Committee are Caucasian.

After review of the briefs, the record shows the plaintiff's allegation that he was discriminated against due to the racial composition of the Peer Review Committee is without merit from a factual standpoint, as Dr. Negi, an Indian-American, was on the committee. This Court also concludes the committee was not specifically and intentionally comprised of individuals who were appointed, but rather, was comprised of individuals who occupied certain staff positions within the facility at that time, thereby providing a legitimate, non-discriminatory reason for the racial composition of the committee.

To avoid summary judgment at this point of the analysis, the plaintiff must demonstrate a genuine issue of material fact exists as to whether the legitimate reasons proffered by the defendant are not its true reasons, but instead are a pretext for discrimination. *Septimus*, 399 F.3d at 609, *citing Okoye*, 245 F.3d at 512. The plaintiff presents no evidence in response to the defendant's presentation of its evidence on this allegation. Considering the foregoing, this Court concludes the plaintiff fails to avoid summary judgment on this issue.

### III.   Conclusion

Thus, for the reasons stated in this Memorandum Ruling, IT IS ORDERED that the defendant's "Second Motion to Dismiss and Motion for Summary Judgment [Doc. 42] is GRANTED, as follows:

IT IS ORDERED that the defendant's motion to dismiss plaintiff's retaliation claim under Rule 12(b)(1) on grounds the plaintiff failed to exhaust his administrative remedies is GRANTED, and IT IS ORDERED that the foregoing claim is DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that defendant's Motion for Summary Judgment seeking dismissal of the plaintiff's race discrimination claims is GRANTED, this Court concluding that the plaintiff fails to present a prima facie case of race discrimination, for the reasons stated in this Ruling.  Considering the foregoing, the plaintiff's race discrimination claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the defendant's Motion for Leave to File a Reply Brief [Doc. 46] is GRANTED, while the plaintiff's Motion for Leave to File a Supplemental Memorandum [Doc. 54] is DENIED AS MOOT for the reasons stated in the Ruling.

As this Ruling appears to dispose of all claims pending in this lawsuit, IT IS FURTHER ORDERED that the parties shall submit a final Judgment, approved as to form, within ten (10) days of the date of this Ruling.

Lafayette, Louisiana, this _5th_ day of December, 2016.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE